**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA LIQUIDATION |
| | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| DIANA MELTON TRUST, | |
| Appellant, | |
| v. | 15-CV-1151 (PAE) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Appellee. | |
| EDWARD A. ZRAICK, JR., et al., | |
| Appellants, | |
| v. | 15-CV-1195 (PAE) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Appellee. | |

| | |
|---|---|
| MICHAEL MOST,<br><br>   Appellant,<br><br>   v.<br><br>IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>   Appellee. | 15-CV-1223 (PAE) |
| AARON BLECKER, et al.,<br><br>   Appellants,<br><br>   v.<br><br>IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>   Appellee. | 15-CV-1236 (PAE) |
| ELLIOT G. SAGOR,<br><br>   Appellant,<br><br>   v.<br><br>IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>   Appellee. | 15-CV-1263 (PAE) |

## BRIEF OF APPELLEE
## SECURITIES INVESTOR PROTECTION CORPORATION

SECURITIES INVESTOR PROTECTION CORPORATION
805 15th Street, N.W., Suite 800
Washington, D.C. 20005
Telephone:  (202) 371-8300
JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel for Dispute Resolution
LAUREN T. ATTARD
Assistant General Counsel

## TABLE OF CONTENTS

**PAGE**

COUNTERSTATEMENT OF THE ISSUE ................................................................. 1

PRELIMINARY STATEMENT ............................................................................... 2

STATEMENT OF THE CASE................................................................................. 4

ARGUMENT ......................................................................................................... 6

   I.   AN OVERVIEW OF SIPA PROTECTION........................................................... 6

        A.   Under the *Net Equity Decision*, the Inter-Account Transfers Deserve  No Special Treatment.................................................................................... 8

   II.   APPELLANTS' ARGUMENTS WERE APPROPRIATELY  REJECTED BY THE BANKRUPTCY COURT .............................................................................. 10

        A.   The Inter-Account Method Does Not Violate the Two Year Statute of Limitations for Fraudulent Transfer Actions, or Due Process............................ 10

        B.   The Inter-Account Method is More Fair than the Last Statement Method................... 11

        C.   The Inter-Account Method Does Not Combine Accounts, and the Last Statement Method Violates Federal Securities Laws ................................... 14

        D.   Public Policy in Favor of Finality in Business Transactions Has No Effect on the Calculation of Net Equity ............................................. 18

        E.   ERISA Does Not Trump SIPA ................................................................. 18

        F.   BLMIS's Corporate Form Prior to 2001 Does Not Change the Calculation of Deposits or Withdrawals ......................................... 19

        G.   Under SIPA, the Net Equity Must Be Calculated By Account, Not By Individual Beneficiaries ................................................................. 21

CONCLUSION...................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>                                                                                    <u>PAGE</u>

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996) ..............................16

*Arford v. Miller* (*In re Stratton Oakmont*), 239 B.R. 698 (S.D.N.Y. 1999),
     *aff'd,* 210 F.3d 420 (2d Cir. 2000) ....................................................................................16

*Banque Worms v. BankAmerica International*, 928 F.2d 538 (2d Cir. 1991) ..............................18

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P*
     *(In re Bayou Group, LLC)* 396 B.R. 810 (Bankr. S.D.N.Y. 2008), *aff'd in part &*
     *rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010) ...............................................................5, 10

*In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2011),
     654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 8, 2011),
     *cert. dismissed*, 132 S.Ct. 2712 (2012),
     *and cert. denied*, 133 S. Ct. 24 and 133 S. Ct. 25 (2012) ........................................ *passim*

*Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*),
     263 B.R. 406 (S.D.N.Y. 2001)..................................................................................16, 17

*Kruse v. SIPC* (*In re BLMIS*), 708 F.3d 422 (2d Cir. 2013) .........................................................21

*In re New Times Securities Services, Inc.,* 371 F.3d 68 (2d Cir. 2004) ........................................16

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974) .........................................................16

*SEC v. S.J. Salmon & Co.,* 375 F. Supp. 867 (S.D.N.Y. 1974) .....................................................16

*SEC v. F. O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ....................................................................7

*Simkin v. Blank,* 19 N.Y.3d 46 (N.Y. Ct. App. 2012)....................................................................14

*SIPC v. BLMIS* (*In re BLMIS*), 499 B.R. 416 (S.D.N.Y. 2013) *certification for interlocutory*
     *appeal denied*, 987 F. Supp. 2d 309 (S.D.N.Y. 2013) ............................................. *passim*

*Stafford v. Giddens* (*In re New Times Securities Services, Inc.*),
     463 F.3d 125 (2d Cir. 2006)...................................................................................16

<u>**TABLE OF AUTHORITIES**</u>
(cont.)

<u>**STATUES AND RULES ......**</u>                                             <u>**PAGE**</u>

Securities Investor Protection Act, 15 U.S.C §

78bbb.................................................................................................................16
78ccc(a)(2)(A)..................................................................................................19
78fff-2(b)....................................................................................................7, 8, 9
78fff-2(c)(1)(B).................................................................................................6
78fff-3..............................................................................................................15
78fff-3(a)(2)....................................................................................................15
78kkk(g)..........................................................................................................16
78*lll*(11)..................................................................................................6, 7, 8

15 U.S.C. §78*o*(b)...........................................................................................19

29 U.S.C. § 1144(d).........................................................................................18

Rules of the Securities Investor Protection Corporation, 17 C.F.R. §300.
100-105.....................................................................................................14, 15
104...................................................................................................................15
503...................................................................................................................17

Registration of Successors to Broker-Dealers and Investment Advisors, Exchange Act Release
      No. 34-31661, 58 Fed. Reg. 7 (Jan. 4, 1993)..................................................20

The Securities Investor Protection Corporation ("SIPC") submits this brief in opposition to the appeal ("Appeal") from the decision and order of the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court")  affirming the application of the inter-account method by Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and Bernard L. Madoff ("Madoff").  The "Inter-Account Method" involves the Trustee's calculation of Appellants' "net equity," which is the amounts, if any, owed by BLMIS to the Appellants, and is calculated by looking to the amount of credit they received for transfers of fictitious profits from other BLMIS accounts.  The "fictitious profits" were the returns that BLMIS fraudulently provided to customers from fake securities trades.  In reality, the "profits" consisted of other customers' cash deposits that BLMIS redistributed in furtherance of the BLMIS Ponzi scheme. The Trustee argued in the Bankruptcy Court that the fictitious profits, in any form, cannot be treated as principal when calculating each of the Appellants' net equity.  In its decision and order, the Bankruptcy Court agreed.

## COUNTERSTATEMENT OF THE ISSUE

Did the Bankruptcy Court err in approving the Trustee's method for computing the "net equity" in a customer account maintained at BLMIS where the balance in the account depends, in whole or in part, on fictitious profits previously "transferred" into that account from another BLMIS account?

---

[1] For convenience, references to provisions of SIPA shall omit "15 U.S.C."

## PRELIMINARY STATEMENT

As the world knows, BLMIS orchestrated a Ponzi scheme in which BLMIS conducted no securities trades, but issued customer statements showing returns for fake securities trading. Under SIPA, a customer's net equity is calculated by determining the amount deposited by the customer with the brokerage less the customer's withdrawals (the "Net Investment Method"). Fictitious amounts  assigned by a brokerage to its customers on customer statements (the "Last Statement Method") are disregarded.  *In re Bernard L. Madoff Inv. Sec. LLC,* 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd,* 654 F.3d 229 (2d Cir. 2011) ("*Net Equity Decision*"), *cert. dismissed,* 132 S. Ct. 2712 (2012), and *cert. den.,* 133 S. Ct. 24 and 133 S. Ct. 25 (2012).

The Trustee applied the Net Investment Method to every BLMIS account.  With respect to BLMIS accounts in which a transfer between two BLMIS customer accounts appeared on the customer's account statement, the transferee received credit for the portion of the transfer, if any, that did not consist of fictitious profit.  If the profit was fictitious, no transfer of funds could have occurred, and thus, no credit could be applied.  The transferor account's net equity limited the amount actually transferred to the transferee account – in other words, the transferee account would only receive credit for the amount of value or net equity that the transferor account could have provided.  Under this "Inter-account Method," the transferred net equity amount would then be used to calculate the transferee account's net equity.

To illustrate: if a transferor deposited $1 million, but withdrew his entire principal ($1 million) from his BLMIS account, and only had fictitious profits in his BLMIS account (say $3 million), his account's net equity would be $0.  If this transferor transferred pro rata the balance of fictitious profits in his account to three BLMIS accounts set up for each of his three sons,

under the Inter-Account Method, each of these transferee accounts would be credited by the Trustee with $0, not the $1 million each son thought he received.

Similarly, if a transferor deposited $1 million, but withdrew nothing, and thus had $1 million in principal and another $2 million in fictitious profits in his BLMIS account, his account's net equity under the Net Investment Method would be $1 million, regardless of the amount the BLMIS statement showed he had.  If this transferor sought to transfer his entire account equally to his three sons, using the Inter-Account Method, each would receive credit for a pro rata share of his net equity – one-third of $1 million, but none would receive credit for their pro rata share of the $2 million of fictitious profits purportedly in the father's account.  Thus, each son would not receive $1 million ($3 million divided by three), as was shown on his statement, but rather $333,333.33 ($1 million divided by three).

Appellants argue that this Inter-Account Method is inappropriate.  They contend that the Trustee should ignore the Second Circuit's decision on the Net Investment Method and accord them special treatment.  They want the Trustee and this Court to ignore the net equity in the transferor account, and treat all fictitious profits transferred as principal, simply because the transfer occurred between or among two or more BLMIS accounts.  In their view,  the fact that fictitious profits, on paper,  moved from one BLMIS account to another transformed fictitious profits into principal for the transferee's benefit, to the detriment of all other BLMIS customers, whose BLMIS accounts' net equities remain calculated pursuant to the Net Investment Method.

The Bankruptcy Court reached the simple, fair, and common sense result that comports with the law.  Decision, dated December 8, 2014 [AA559] ("*Inter-Account Decision*").  When fictitious profits are moved from one BLMIS account to one or more BLMIS accounts, the fictitious profits retain their status as fictitious profits.  Profits that do not exist and move only on

paper from the transferor's account do not magically become real for the transferee's benefit. Implicit in the Inter-Account Method is the recognition that the fictitious profits assigned by BLMIS are not connected to reality, and the "transfer" of fictitious profits from the transferor's account to the transferee's account cannot be treated – *instant presto* – as if it were a deposit of real cash in the transferee's account.  Any other result would be inconsistent with the treatment afforded to all other BLMIS customers under the Net Investment Method.

Yet, in their briefs, Appellants ignore the Second Circuit decision and contend that the Trustee should credit the transfer of fictitious profits using the fictitious profits that are on the transferor's BLMIS statements.  This suggestion is merely the latest iteration of the Last Statement Method previously rejected by the Second Circuit in the *Net Equity Decision*, and should be summarily dismissed.

## STATEMENT OF THE CASE

In a Motion to the Bankruptcy Court, the Trustee asked the Court to approve his Determinations of the Appellants' claims.  SIPC filed a brief in support of the Motion.

Appellants had accounts at BLMIS which had received transfers of principal and/or fictitious profits from other BLMIS accounts.  In determining the Appellants' claims for net equity, the Trustee provided the Appellants with credit only for the cash Appellants deposited in their accounts or for cash deposited in the transferor's account and that was available at the time of transfer from that transferor account.  Thus, using the Net Investment Method, the Trustee first calculated the amount of principal available for transfer from the transferor account.  Then, under the Inter-Account Method, the net equity of the transferor account was used to determine the amount of credit that Appellants received for the transfer into their transferee accounts.  In

this manner, the net equity of the transferee accounts was calculated. The Trustee did not credit the Appellants with any fictitious profits that were transferred.

After full briefing and a hearing, the Bankruptcy Court issued its *Inter-Account Decision*. In the *Inter-Account Decision*, the Bankruptcy Court detailed the holdings in the *Net Equity Decision* and this Court's decision in *SIPC v. BLMIS (In re BLMIS)*, 499 B.R. 416 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"), *certification for interlocutory appeal denied*, 987 F. Supp. 2d 309 (S.D.N.Y. 2013). The Bankruptcy Court also explained that in the *Antecedent Debt Decision*, this Court directly addressed the treatment of inter-account transfers. *See Inter-Account Decision* at 9.

The Bankruptcy Court highlighted the following holding from the *Antecedent Debt Decision*:

> Although defendants contend that the Trustee's method elevates form over substance, the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal. . . . . In other words, no new value was created by moving these funds between different accounts.

*See Inter-Account Decision* at 10 *quoting Antecedent Debt Decision*, 499 B.R. at 428-29. In its *Antecedent Debt Decision*, this Court followed the holding in *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P (In re Bayou Group, LLC),* 396 B.R. 810, 884 (Bankr. S.D.N.Y. 2008), *aff'd in part & rev'd in part,* 439 B.R. 284 (S.D.N.Y. 2010). *See Inter-Account Decision* at 11. Finally, the *Antecedent Debt Decision* rejected one of the arguments made by Appellants here when it held that the Trustee's method for calculating net equity does not violate the statute of limitations for avoidable transfers. *Id*; *Antecedent Debt Decision*, 499 B.R. at 429.

The Bankruptcy Court concluded that the Trustee's Inter-Account Method is entitled to deference because it "is not 'clearly inferior,' and indeed, is superior to the alternative

championed by the [Appellants]." *Inter-Account Decision* at 12.  The Bankruptcy Court noted the parallels between the shortcomings of the Last Statement Method, as discussed in the *Net Equity Decision*, and the shortcomings of Appellants' recommended method here.  *Id.* Appellants' method "aggravates the injury to those net losers who did not receive transfer of fictitious profits by diminishing the amount available for distribution from the limited pool of customer property." *Id.* at 12-13.

In its ruling, the Bankruptcy Court specifically addressed and rejected each of the Appellants' arguments seriatim.   In 14 of the 29 pages in the *Inter-Account Decision*, the Bankruptcy Court rejected Appellants' arguments that (1) the Inter-Account Method violates the two year statute of limitations for fraudulent transfer actions; (2) the Inter-Account Method leads to arbitrary results; (3) the Inter-Account Method improperly combines accounts and violates federal securities laws; (4) the Inter-Account Method should be rejected because public policy favors finality in business transactions; (5) the Inter-Account method violates ERISA; (6) the Bankruptcy Court lacks constitutional authority to render final judgments; (7) the Trustee cannot disallow transfers that occurred prior to 2001 because BLMIS was a sole proprietorship at that time; and (8) a transferee's net equity claim should not be affected by withdrawals made by other beneficiaries in a shared account.

This Appeal followed.

## ARGUMENT

## I.    AN OVERVIEW OF SIPA PROTECTION

A customer's claim is determined by calculating the customer's "net equity."  *See* SIPA § 78fff-2(c)(1)(B).  SIPA section 78*lll*(11) (2008) states, in relevant part:

> The term "net equity" means the dollar amount of the account or
> accounts of a customer, to be determined by-

> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date all securities positions of such customer (other than customer name securities reclaimed by such customer; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

"Customer" status under SIPA is determined on a transaction-by-transaction basis. That an investor is a "customer" as to one transaction does not make him a "customer" for all time as to all transactions or amounts claimed. Customer status "in the air" is insufficient to confer such status as to all amounts sought by a claimant against a broker if outside the ambit of SIPA. *See SEC v. F. O. Baroff Co.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974); *SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985).

In the *Net Equity Decision*, the Second Circuit was asked whether the proper method for calculating the amount owed to a customer in this case was the Net Investment Method, which looks only to a customer's deposits and withdrawals, or the last statement method, which looks only to the fictitious account statements issued by BLMIS reflecting fictitious profits. The Circuit determined that the Net Investment Method was the method most consistent with the definition of "net equity" and with SIPA. 654 F.3d at 235. In reaching that conclusion, the court based its decision on the language of SIPA, the equal treatment of customers under SIPA, and the consequences of viewing the fictitious statements as real. *Id.* at 235.

In its analysis, the Circuit first considered two provisions of SIPA: the definition of net equity in SIPA section 78*lll*(11), and SIPA section 78fff-2(b), which states that net equity is to be determined in accordance with the books and records of the debtor. *Id.* at 236-37. The Circuit reasoned that because the statements were rigged "after-the-fact constructs," and because the recovery of fictitious profits would result in inequitable treatment of customers, some of whom

had not withdrawn any funds before the fraud was exposed, the Net Investment Method was a better measure of net equity.  *Id.* at 238.  The Circuit also noted that "the Net Investment Method allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records."  *Id.* at 238-39.

The Circuit next examined the purpose and design of SIPA.  The Circuit explained that SIPC is not an "insurance provider," and SIPC does not protect against all forms of fraud.  *Id*. at 239.  Rather, the purpose of "net equity" is to "achieve a fair allocation of the available resources among the customers," and the Net Investment Method was the proper way to achieve that result. *Id.* at 240.

A. **Under the *Net Equity Decision*, the Inter-Account Transfers Deserve No Special Treatment**

The Trustee's use of the Inter-Account Method comports with the language of SIPA, the purposes of SIPA, and the interpretation of the Second Circuit.  Indeed, the rationale of the *Net Equity Decision* applies with equal force here.

The essential question presented by the Appellants is how to calculate a customer's net equity when fictitious profits have been transferred on paper from one BLMIS account to another.  The first step is to examine the statute, as the Second Circuit did in its analysis.  *See Net Equity Decision*, 654 F.3d at 236-37 ("We begin where all such inquiries must begin: with the language of the statute itself" (internal quotations omitted)).   The same two provisions considered in the *Net Equity Decision* are directly relevant to determining how much Appellants are owed here.  First, the definition of "net equity" under SIPA section 78*lll*(11) requires the trustee to determine the amount owed to the customers, and second, section 78fff-2(b) requires that such information either be ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee.  *See* 654 F.3d at 237 (reading the two

provisions in concert).   As the Second Circuit explained, the books and records and other information showed that the "trades" were backdated and fake, that the "profits" were non-existent, that certain Appellants withdrew more than they deposited into their accounts, and that "securities" "purchased" with fake sales proceeds in fact were never paid for by the customer. *Id*. at 231-33.  For the Trustee to ignore what the books and records show and to satisfy net equity claims based *solely* upon fictitious account statements or "transfers," on paper only, of fictitious profits violates SIPA § 78fff-2(b).  Because the "profits" were imaginary, no transfer of such amounts could have been made, and thus, a customer's net equity could not receive credit for what has not occurred.  *See id.* at 238-39 (holding that "the Net Investment Method allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records.").

The inclusion of fictitious profits in the calculation of net equity, as Appellants request, is also in violation of the purpose and design of SIPA.  As the Second Circuit stated, SIPC does not provide insurance, and SIPA does not protect against all forms of fraud.  *Id.* at 239.  Like the situation presented by the *Net Equity Decision*, Appellants' receipt of advances based on fictitious profits "will necessarily diminish the amount of customer property available to other investors."  *See id.* at 240.  Because Appellants' theory would render a "fair allocation" impossible, it is inconsistent with the objective of SIPA.  *See id.*

The Determinations also comport with other case law in this Circuit.  In addition to the Second Circuit's *Net Equity Decision*, the District Court has explicitly recognized in the context of a fraudulent transfer suit that "the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity

or, for example, transfers among family members, does not morph those funds into actual new principal." *Antecedent Debt Decision*, 499 B.R. at 428-29. "[I]t is irrelevant that certain . . . transfers established new accounts and therefore new customer-broker relationships." *Id.*

Finally, the same argument made by the Appellants was rejected in *In re Bayou Group, LLC*, 439 B.R. 284, 338-39 (S.D.N.Y. 2010).  In that case, the court held that because the profits were fraudulent, the transfers of principal and fictitious profits could not be "worth what Bayou reported them to be worth at the time."  *Id.* at 339.  "Instead, Bayou inflated their value in furtherance of the larger fraud scheme."  *Id.*  The situation is virtually identical here, where the fictitious profits reportedly transferred, if treated as real, would only perpetuate the fraud perpetrated by Madoff.

## II.   APPELLANTS' ARGUMENTS WERE APPROPRIATELY REJECTED BY THE BANKRUPTCY COURT

As has become customary in this liquidation, Appellants repeat the same arguments which have been rejected by this Court in the *Antecedent Debt Decision* and/or rejected by the Bankruptcy Court.  Many of these arguments, as the Bankruptcy Court noted, are similar to the arguments rejected by the Second Circuit in the *Net Equity Decision*, because they ask this Court to "turn[] Madoff's fiction into a fact."  *Inter-Account Decision* at 12.

### A.  The Inter-Account Method Does Not Violate the Two Year Statute of Limitations for Fraudulent Transfer Actions, or Due Process

Appellants argue that when the Trustee gives credit only for the amount of cash deposited with BLMIS, he is effectively violating the two year statutory look back period for fraudulent transfer actions.  *See* Appellants' Brief, ECF No. 14 ("Blecker Brief") at 13.  This argument has been rejected by the Bankruptcy Court and by this Court in the *Antecedent Debt Decision*, and for good reason.

The Bankruptcy Court explained that the relevant question here is not about disturbing or avoiding a transfer, but about determining the value of what was transferred. *Inter-Account Decision* at 13. For this reason, the Inter-Account Method does not implicate the statutory look back period. By giving credit only to the transfers of principal and refusing to give credit for the transfers of fraudulent transfers, the Trustee is simply determining Appellants' claims consistent with SIPA. Refusing to give credit for a claim is not the same as avoiding a transfer, and thus is not subject to a statutory look back period.

This Court's holding in the *Antecedent Debt Decision* is also instructive. There, this Court was asked whether the Trustee could avoid transfers of fictitious profits in light of an asserted defense that the transfer had been provided "for value" or on account of antecedent debt. This Court explained that the computation of the "value" defense under the fraudulent transfer laws has no look back period, and thus the Trustee must look to the true "value" of the transfer – the amount of cash deposited – regardless of how far back that deposit took place. 499 B.R. at 427. In other words, the look back period did not apply to the computation of value of the transfer. Likewise, here, the issue of the proper amount to credit the Appellants – the amount of value they provided to the estate – has no statutory look back period.

Appellants also argue that the Trustee's method violates their due process rights for the same reason. As the Bankruptcy Court stated, "[t]his contention elevates a faulty statutory argument to the level of an equally faulty Constitutional claim . . . ." *See Inter-Account Decision* at 14 n.8.

## B.  The Inter-Account Method is More Fair than the Last Statement Method

Appellants argue that the Trustee's method is unfair and arbitrary. *See* Blecker Brief at 21, Elliot G. Sagor, Appellant, Memorandum of Law Urging Remand or Reversal of Judge Bernstein's Inter-Account Transfer Decision insofar as it Refused Sagor's Return of His

Investment of $175,000, ECF No. 13 ("Sagor Brief") at 22.  To the contrary, the Trustee's Inter-Account Method is the most consistent method for all customers.

The Bankruptcy Court correctly found the Inter-Account Method to be more fair than the Last Statement Method, and drew on the Second Circuit's conclusion in the *Net Equity Decision* that the Net Investment Method is more fair than the Last Statement Method.  *Inter-Account Decision* at 15.  Appellants' arguments below, like here, focused on the differences in treatment if the transferor had chosen another method for transfer.  *Id.*  The Bankruptcy Court rejected this argument, calling it "hardly [] compelling," because the Appellants' method requires giving legal effect to Madoff's fraud.  *Id.*

Nonetheless, using faulty reasoning, the Appellants in the Blecker Brief point to two scenarios, each using a different method of transfer, in an attempt to transmogrify fictitious profits into principal. *See* Blecker Brief at 21-22.  Under Scenario 1:

1. BLMIS writes Customer A a check comprised of fictitious profits;

2. Customer A deposits the check in Customer A's checking account;

3. Customer A writes Customer B a check drawn on Customer A's checking account;

4. Customer B deposits Customer A's check into Customer B's checking account; and

5. Customer B writes a check to BLMIS for deposit into Customer B's brokerage account.

Under this Scenario 1, Customer B receives full credit for the deposit to his BLMIS account as if the funds were principal.  As a practical matter, Customer A's account is debited the amount of the withdrawal.  Customer A receives the check from BLMIS and deposits it at the bank. Similarly, when Customer B writes a check to BLMIS, Customer B is ultimately credited with that deposit as principal in Customer B's net equity calculation.

Scenario 2, on the other hand, consists of a supposed inter-account transfer between Customer A's BLMIS account and Customer B's BLMIS Account.

Appellants incorrectly argue that there is no difference in the outcome between Scenario 1 and Scenario 2.    Under Scenario 1, in order for BLMIS to write a check to Customer A to withdraw the fictitious profits from Customer A's account, BLMIS takes cash belonging to other customers and gives it to Customer A in the form of fictitious profits.  Customer A has made a withdrawal of real cash, albeit constituting fictitious profits.  The Trustee, of course, would have the obligation and right to pursue an avoidance action under Title 11 of the United States Code (the "Bankruptcy Code") against Customer A for the receipt of fictitious profits.

In contrast, under Scenario 2, no such withdrawal or monetization occurs.  Because no profits exist to transfer, the illusion of a transfer on paper only, between or among BLMIS accounts, does not monetize the sum.  The non-existent nature of the property does not change when "transferred" between or among BLMIS accounts.  Customer B will not be entitled to the amount "transferred" from another BLMIS account within BLMIS because the transfer is comprised of fictitious profits.  If Customer B makes a withdrawal of the amount, BLMIS will take cash belonging to other customers and give it to Customer B.  The Trustee would then have the obligation and right to pursue an avoidance action against Customer B for the receipt of fictitious profits.  In that instance, the corresponding debit to Customer B's BLMIS account, upon the withdrawal by Customer B from his account, must be a reduction or offset against any deposits of real cash in Customer B's BLMIS account.

The facts in Scenario 1 rely on hypotheticals: a financial institution conducting real financial transactions (deposits and withdrawals on three separate and real checking accounts), none of which happened in the transactions at issue here in BLMIS.  Rather, the scenarios

13

presented in the Blecker Brief show how the determination of Customer A and Customer B's net equities changes in each of the two scenarios.  In both cases, only one customer – either Customer A or Customer B – effectively receives credit for the deposits as principal, and only one customer bears the consequences of a withdrawal and the avoidance action by the Trustee. When viewed from the perspective of other customers who have yet to receive back their principal, Appellants' arguments about fairness, or the absence thereof, fail on their face.

For many of the Appellants, the inter-account transfers purported to be gifts, inheritances, or other transfers between and among related individuals.  If the transfer between Customer A and Customer B was the result of an arm's-length transaction, it is questionable that the validity of the transfer could be called into question.  In fact, the New York Court of Appeals has decided at least one analogous situation.  *See Simkin v. Blank*, 19 N.Y.3d 46 (N.Y. Ct. App. 2012) (holding that divorce agreement that was finalized before the Madoff fraud was revealed could not be unwound on the doctrine of "mutual mistake" even though one party received the Madoff account in the settlement and thus bore the losses alone).  But whether Customer B provided consideration for the transfer, and was owed the amount transferred to him, is a matter for resolution between the two customers and has no impact on the calculation of his or her net equity.

### C. The Inter-Account Method Does Not Combine Accounts, and the Last Statement Method Violates Federal Securities Laws

Appellants argue that by treating the accounts of transferors and transferees separately for determination of net equity, the Trustee is "collapsing" accounts in violation of SIPC's Series 100 Rules, 17 C.F.R. §§ 300.100–300.105. *See, e.g.*, Blecker Brief at 16.  To the contrary, the Trustee is determining claims in accordance with the Series 100 Rules.  The Bankruptcy Court agreed, and simply stated that "[t]he objection is wrong."  *Inter-Account Decision* at 18.

SIPA section 78fff-3, which provides for SIPC advances for the benefit of customers up to statutory limits, states that "a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity." SIPA § 78fff-3(a)(2). The SIPC Series 100 Rules specify how accounts of separate customers are identified.   Under SIPC Rule 104, 17 C.F.R. §300.104, for example, a trust account created, under a valid written trust instrument, is deemed to be held by a customer in a separate capacity from, for example, an account held by the customer in his own name.   Thus, the trust account would be separately eligible for the maximum amount of SIPC protection from any other account held by the customer in a separate capacity.

In determining Appellants' claims, the Trustee treated each account held in a different capacity separately in accordance with the SIPC Series 100 Rules.   Transfers of principal away from each of the transferor accounts were deposited into the transferee accounts, which, for most if not all of the Appellants, were accounts of separate customers.   The nature of the fictitious profits did not change, and such fictitious profits were not transformed into principal, by the transfer of the fictitious profits into a different account.   *See Antecedent Debt Decision*, 499 B.R. at 428-429.

If the Trustee were to combine accounts, which he did not, he would have credited all deposits and debited all withdrawals from the        two accounts, determined the net equity for both accounts as if they were one, and then provided the SIPC protection of up to $500,000 only once to the new combined account, not to the accounts separately.   The Trustee did not do that here, and thus there is no violation of the SIPC Series 100 Rules.

Rather, if the Court were to give effect to fictitious profits on the account statements, as Appellants suggest, it would rubber-stamp fraud and other bad acts of a broker.   In that vein,

courts consistently have recognized that SIPA and rules promulgated thereunder "manifest a design to deny protection to transactions tainted by fraud." *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 435 (S.D.N.Y. 2001). *See Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698, 701 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 420 (2d Cir. 2000); *SEC v. S.J. Salmon & Co.,* 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974); *In re Adler, Coleman Clearing Corp.*, 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996). Where a claimant undertakes no market risk, and can claim entitlement to cash or securities only because of a broker's fraud, no "customer" relief under SIPA is available. *See, e.g., Stafford v. Giddens (In re New Times Securities Services, Inc.)*, 463 F.3d 125, 130 (2d Cir. 2006); *In re New Times Securities Services, Inc.,* 371 F.3d 68 (2d Cir. 2004); *Mishkin*, 263 B.R. at 435. One reason for this outcome is that SIPA's goal of customer protection must be carried out consistent with the securities laws of which SIPA itself is a part.

Except as otherwise provided in SIPA, the provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("the 1934 Act"), apply as if SIPA were an amendment to, and a section of the 1934 Act. SIPA § 78bbb. Moreover, as explicitly provided in SIPA, while a primary function of SIPA is to protect investors, another central feature is to reinforce the broker-dealer's financial responsibility requirements so that the securities laws are strengthened and not weakened.[2] *Cf., SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 985 (2d Cir. 1974) (purpose of SIPA is to strengthen market. Goal is not served by reimbursing from public funds one whose fraudulent activities have weakened it). The fact that SIPA has more than one

---

[2]   As one example, under SIPA §78kkk(g), Congress charged the SEC with compiling a list of unsafe and unsound industry practices and required it to report upon the steps being taken under existing law to eliminate such practices and to provide recommendations for additional legislation needed to eliminate them.

purpose and that those purposes supply the reason for SIPC Rule 503, 17 C.F.R. §300.503,[3] was

summed up by the District Court in *Mishkin, supra,* 263 B.R. at 434-435, as follows:

> [The broker's] extensive fraud has overarching significance and
> implications for the transactions that culminated in the Challenged
> Trades....    Contrary to Appellants' perceptions of these events,
> [the broker's] deeds cannot be ignored in assessing whether
> Appellants are entitled to enforce the Challenged Trades.  While it
> is true that one of SIPA's primary objectives is to protect
> individual customers from financial hardship, the legislation also
> embodies parallel and complementary aims....

> \* \* \* \*

> The SIPC 500 Rules, promulgated in 1988, ... reflect these ends.
> They safeguard securities customers' legitimate claims to cash and
> securities held by the debtor in their accounts prior to filing date,
> and also manifest a design to deny protection to transactions
> tainted by fraud.

To require the Trustee to rely on the fictitious account statements would give credence to

the backdated trades and fake profits that were invented out of thin air by BLMIS and carried out

by BLMIS in flagrant violation of the securities laws.  While a central goal of SIPA is to protect

customers, the protection cannot be at the expense of undermining the securities laws.  As a

result, the Trustee cannot treat the transfers of fictitious profits – clear violations of the securities

laws – as "new principal" worthy of protection from SIPC and a distribution from the fund of

customer property.

---

[3]  SIPC's Series 500 Rules, 17 C.F.R. §300.500-300.503, define when a customer has a claim for
cash versus securities.  Under Rule 503, nothing in the Rules can be construed as limiting a
trustee's right to avoid securities transactions that are fraudulent, preferential, or otherwise
voidable.

**D.  Public Policy in Favor of Finality in Business Transactions Has No Effect on the Calculation of Net Equity**

Appellants also argue that public policy favors finality in transactions, and as such, the Appellants should receive credit for transfers of fictitious profits.  *See* Blecker Brief at 18.  The Bankruptcy Court also rejected this argument because '[t]he Inter-Account Method does not implicate New York's public policy regarding the finality of transactions, mistaken or otherwise . . . ."  *Inter-Account Decision* at 20.  The Bankruptcy Court also noted that concerns about finality in general "must yield to the supremacy of federal law," namely, SIPA.  *Id.* at 21.  The law of gifts, state law property rights, and other laws that the Appellants cite for finality of transactions are inapplicable to claim determinations in a SIPA liquidation.  *See, e.g.*, Blecker Brief at 13-16.  The calculation of net equity for an inter-account transfer does not concern whether transfers were authorized as between two account holders.  Certainly, Appellants make no allegation that the transfers were unauthorized or unilaterally made on the Debtor's initiative.[4] Rather, the transfers were initiated by the Appellants, who are responsible for the repercussions.

**E.  ERISA Does Not Trump SIPA**

Appellant Michael Most also challenges the use of the Inter-Account Method in retirement accounts, arguing that ERISA mandates a different result.  *See* Brief of Appellant, Michael Most ("Most Brief") at 8.  The Bankruptcy Court quickly and easily dismissed this objection by noting the clause in ERISA which subordinates it to other federal statutes.  *See* 29 U.S.C. § 1144(d); *Inter-Account Decision* at 22.

---

[4] Cases cited by Appellants, such as *Banque Worms v. BankAmerica International*, 928 F.2d 538 (2d Cir. 1991), are distinguishable for other reasons as well.  In *Banque Worms*, for example, the Second Circuit court applied New York law on restitution, which is not applicable here, to determine whether a mistaken payment should be returned.  *Id.*  Here, Appellants are not asking the Trustee to return a mistaken payment, but rather to pay Appellants based on fictitious profit.

Appellant conflates the issue of claim determination with avoidance.  *See* Most Brief at 8-15.  Even assuming, *arguendo*, that ERISA affected the Trustee's ability to avoid transfers of fictitious profits under the fraudulent transfer provisions of the Bankruptcy Code, these provisions would not affect the determination of a customer's net equity under SIPA.  Indeed, no provision of ERISA places limits on the way that net equity is determined under SIPA.  As the Bankruptcy Court stated, "SIPA's net equity calculation as approved in the Second Circuit's *Net Equity Decision* trumps any affect ERISA might have on the net equity calculation."  *Inter-Account Decision* at 22-23.

**F.  BLMIS's Corporate Form Prior to 2001 Does Not Change the Calculation of Deposits or Withdrawals**

Appellants make a complicated argument that the corporate form of BLMIS changes the calculation of deposits and withdrawals.  *See* Blecker Brief 13-15.  According to Appellants, because BLMIS was formed in January 2001, the Trustee is impermissibly reducing the amount of a customer's claim based on transfers of fictitious profits before that time.  In rejecting this argument, the Bankruptcy Court observed that "[t]hey do not make the same argument for ignoring deposits made before 2001."  *Inter-Account Decision* at 25.

The Bankruptcy Court correctly found that BLMIS's change in corporate form has no bearing on the calculation of net equity.  The basic facts are as follows:

On December 31, 1959, Bernard L. Madoff, a sole proprietorship, filed Form BD to register with the Securities and Exchange Commission ("SEC") as a broker dealer.  *See* Declaration of Kevin H. Bell, dated June 6, 2014 [T. App. 173] ("Bell Declaration"), Exhibit A.

On December 30, 1970, when SIPA was enacted, that sole proprietorship became a member of SIPC.  SIPA § 78ccc(a)(2)(A) (stating that all brokers or dealers registered under 15 U.S.C. §78*o*(b) are required to be SIPC members).

19

On January 12, 2001, BLMIS filed a Form BD-Amendment.  *See* Bell Declaration, Exhibit B.  In that form, BLMIS stated that its predecessor's name was Bernard L. Madoff, and "[e]ffective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities, related to predecessor's business.  The transfer will not result in any change in ownership or control." *Id.* at 9-10.  In addition, in question 5, regarding succession, BLMIS checked "yes" to the question of whether the applicant is succeeding to the business of a currently registered broker-dealer.  *Id.* at 4.

As a successor broker-dealer, BLMIS agreed to take over the assets and liabilities of Bernard L. Madoff, the sole proprietorship. *See, e.g.*, Registration of Successors to Broker-Dealers and Investment Advisors, Exchange Act Release No. 34-31661, 58 Fed. Reg. 7, at 8-9 (Jan. 4, 1993).  "To ensure that there is a legitimate connection between the predecessor and successor, no entity may rely on the successor rules unless it is acquiring or assuming substantially all of the assets and liabilities of the predecessor's broker-dealer . . . business." *Id.* at 8.  In this case, BLMIS was permitted to file an amendment form because the amendment was the result of a formal change in the structure or legal status of the broker-dealer, and did not involve a practical change in the control or operations of the broker-dealer or advisor.  *Id.* at 8-9.

Appellants argue that "Madoff as an individual is identical to Madoff as a sole proprietor."  *See* Blecker Brief at 14.  Appellants use this argument to suggest that even though the assets and liabilities of the sole proprietorship were transferred to BLMIS, the Trustee cannot now treat the sole proprietor's customers as BLMIS's customers, but ostensibly should pay the net equity claims of the sole proprietor's customers.  The argument defies logic.  Accordingly, Appellants' arguments to disregard transfers prior to the formation of BLMIS must be rejected out of hand.

### G. **Under SIPA, the Net Equity Must Be Calculated By Account, Not By Individual Beneficiaries**

Some of the other arguments raised by Appellants also should be rejected out of hand because they are outside the scope of the Trustee's motion. For example, Elliot Sagor raises the issue of whether calculation of net equity should be done on an individual rather than on an account basis. *See* Sagor Brief at 29. Essentially, he is arguing that the calculation of the transferor account liability should not occur on an account basis. In Mr. Sagor's case, the transferor account had multiple individuals or beneficiaries, and the net equity of the transferor account was affected by withdrawals by other individuals or beneficiaries – that is, all principal was withdrawn leaving only fictitious profits. Mr. Sagor posits that (1) the net equity on the account should be calculated individually according to each person's net deposits and withdrawals into that account, and (2) the Trustee should ignore reality. To the contrary, a SIPA trustee must calculate the net equity for these types of accounts as whole and not according to individual stakeholders' net deposits and withdrawals *within* that one account. *See Inter-Account Decision* at 26-27 *citing Kruse v. SIPC (In re BLMIS),* 708 F.3d 422, 426-27 (2d Cir. 2013) (investors in feeder funds that invested with BLMIS were not customers of BLMIS).

Here, Mr. Sagor asks the Trustee and this Court to referee a dispute that more accurately is between or among him and the other beneficiaries of the transferor account who took out all of its principal leaving the BLMIS account and Mr. Sagor only with fictitious profits. If the transferee did not receive the full benefit of his bargain with the transferor, the transferee might have a rescission claim, or some other claim, against the transferor. But the question of whether the transferee provided value for the transfer, and the consequences thereof, ultimately is irrelevant to the calculation of a BLMIS customer accountholder's net equity under SIPA.

## <u>CONCLUSION</u>

For all of the aforementioned reasons, the Bankruptcy Court Order should be affirmed.

Dated: Washington, D.C.
      May 27, 2015                  Respectfully submitted,

                                 JOSEPHINE WANG
                                 General Counsel

                                 */s/ Kevin H. Bell*
                                 KEVIN H. BELL
                                 Senior Associate General Counsel for
                                  Dispute Resolution

                                 LAUREN T. ATTARD
                                 Assistant General Counsel

                                 SECURITIES INVESTOR
                                  PROTECTION CORPORATION
                                 805 15th Street, N.W., Suite 800
                                 Washington, D.C. 20005
                                 Telephone: (202) 371-8300
                                 E-mail: jwang@sipc.org
                                 E-mail: kbell@sipc.org
                                 E-mail: lattard@sipc.org